1-460-86, Bank of Nevada Rebates Award for Kellogg Company, Arlington, Massachusetts, is being presented to you today from Kellogg. When you're ready, you may proceed. May it please the Court, David Boudet with the Law Firm Miller Johnson representing the Kellogg Company here today. May I please reserve two minutes for rebuttal? Certainly. Thank you, Your Honor. The District Court's findings are clearly erroneous. Under the standard applicable in this circuit, the District Court needed to make factual findings that were consistent with the underlying legal theory. The underlying legal theory that the judge found to be substantial was that Kellogg's proposals in Memphis would change the definition of casual employees  and the totality of that would result in Kellogg not hiring any more regular employees and instead hiring all casual employees and that would thereby modify the master agreement. This factual finding is clearly erroneous because it conflicts with a number of things. First of all, the administrative law judge made the following finding at page 14. The finding is the master agreement does not guarantee any minimum hours of work over time or particular schedules or limit the number of hours casuals can be used or the scope of their duties. That finding was set forth in his opinion and it was not accepted to by either the General Counsel or the unions. Under the board rules, those are the facts of the case. The reason they didn't accept to it is because it's the truth. It's the truth. The master agreement doesn't provide for any hours for regular employees. When you say they didn't accept to that, that means that that is accepted then as a given in connection with the ultimate appeal to the board? Is that how that works? That's correct. Thank you. The reason they didn't, again, is because that's the truth. When you look at the master agreement itself, the master agreement spells out which things should be covered at local negotiations and which things are covered by the master. Specifically in the document, it states under 101C that this agreement shall cover only those matters specifically included herein. Only those matters specifically included in this master agreement. And then in 101F, it says that those matters which have been covered, which are specifically included in the master, will not be bargained at a local level. When you look at this agreement, the joint agreement, the master agreement, when you look at it, the only reference to casuals is at page 67. And there it sets forth a wage differential. So there is no work preservation language. There is no language that supports the judge's finding, the judge's conclusion, I should say, that there is something being modified in the master by virtue of Kellogg having proposed the right to hire all casual employees by changing the definition of casual employees. And also the district court in its finding, at page 4 of its finding, he stated the following. He said the master agreement, I'm quoting, does not define casuals, the scope of their employment, or provide for benefits. Mr. Boudet, I don't think there's any disagreement about everything you've been talking about so far. The question is, can the board advance this theory that seems to be inconsistent with Milwaukee Spring that deals with this indirect effect argument that in turn is premised upon the loose statements that were made at the bargaining session? So could you talk to Milwaukee Spring and what your bargaining agent said, which at least to me seems to get to the heart of this case? Sure. You're right. Milwaukee Springs is the settled law. It's the established law in precedent. And in measuring reasonable cause, as their substantial legal theory, the judge was obligated to measure that reasonable cause standard against settled law. And what Milwaukee Spring teaches is that in order for the general counsel to establish a modification, he must first identify specifically in this agreement, the master agreement, what provision is specifically being modified, and then he must take the actual last best offer and say that it's direct. And why is that? It's that way because national labor policy wants people to bargain and it doesn't want the courts and the boards to imply or to infer provisions into an agreement that doesn't exist. Obviously, if the board gets to change their mind, that's sort of the nature of the NLRB, it seems to me. So would I be right in assuming then your position would be that maybe they can prevail at the board level by getting the board to overturn Milwaukee Spring, but in the meantime they can't get injunctive relief based on a premise that the board should do that? Is that sort of what this comes down to? Agreed, Your Honor, because the regional director and general counsel aren't entitled to any particular deference. The regional director and general counsel espousing a change in the law under your question is just that, them espousing a change in the law. What's entitled to deference and what's entitled to a measurement against which the reasonable cause should be measured is the established board precedent, an established board precedent in Milwaukee Springs. In the NLRB response to that, I think by saying that the board had to have authorized seeking this injunctive relief knowing that it was contrary to Milwaukee Spring. Well, Your Honor, that presumes lots of things of which there is no record. A 10-J is not issued in a public forum. There is no oral argument and there is no record of it. We have no idea what it is that the board considered, what law was in front of it. If the facts that were put in front of them and the statements are contained in the brief, which is as straightforward as this, as your general counsel states in its brief, the general counsel says, Kellogg's proposals modified the terms of the master. It can't do that. I don't know if that's all they were told. I don't know what information was provided to the board. And if the standard then is, reasonable cause standard is, we defer to the board's judgment on 10-J, then it eviscerates the reasonable cause standard. And the standard under Milwaukee Springs, Your Honor, just to back up a little bit, if you look and you read that case, you'll see that the general counsel tried this legal theory out in the 70s. The board agreed with the general counsel in a couple of cases, one in the Seventh Circuit, University of Chicago, one in the Ninth Circuit, the Boeing Corporation. In both cases, the circuit courts would not defer to the board on those. And they said, it doesn't make sense. It doesn't make sense because what you're asking the board to do and the courts to do is to imply union security clauses into the agreements that the parties didn't negotiate. In those cases, the board, the general counsel and board were saying the recognition clause would provide those work preservation. And then Milwaukee Springs follows from that in 1984, and the board slams the door shut. And they slammed the door shut for good reasons. Think about what's happened in this case here. What are the bargaining rules? The general counsel's theory is that we can't bargain about casuals too much because they concede that casuals are a topic for local negotiations, as they must. The proposal here is to essentially eliminate regular employees. It's not a case of just a little bit. It's a lot. And again, I would go back to the judge's findings that were not accepted to and answer it this way. That theory, first of all, suggests that there's some union security that's provided for by the wage and benefit provisions of the master. The provisions that the general counsel cites to his brief, for example, Section 5.04, double time, COLA. How does double time and COLA amount directly to a contract provision that says we can't hire too many casual employees? My understanding of what the company wanted was to be able to lay off regulars and replace them with casuals, and so thereby eliminating all of the terms that would apply to regular employees. That, again, is a red herring for a couple of reasons. First, Kellogg can't do that. Kellogg can't do that under the master agreement. It can't do that under its proposed changes to the supplemental agreement. The testimony of Lacey Ivey, which was uncontradicted, made that clear, where Kellogg proposed the changes in temporary layoffs versus permanent layoffs. In temporary layoffs, on the record, they're two weeks or less because the regular employee can come back. In addition to that, Your Honor, in the actual offer itself, in the last best offer, which is Joint Exhibit 5, the employer made it crystal clear that that was not its intent. During the course of bargaining, it came across the table, hey, are we going to replace all regulars? And Kellogg said, absolutely not. Are you going to change the terms of... What does it say in the last best offer that you read to say that they're not doing that? Let me get this right. It says in the last best offer, it says, in other words, Kellogg is not proposing any wage or benefit reductions to unit employees. It says, although... This is on page 2. Although Kellogg would have additional management rights to hire new casual employees under its proposals, the company could not exercise these rights if that decision would cause the layoff of a current non-casual unit employee in the plant today. And then in the actual proposals themselves... In other words, the way it works, I guess, in the industry, you could lay somebody off if you didn't need their services, but you can't lay them off if your intention is to bring back somebody part-time or casual or whatever you might call it to replace them. Is that it? There's a distinction between a temporary layoff... For example, they have to do cleanings of their lines. And so the line gets shut down for a week or two and people get laid off. Well, they're coming back when the machine's clean. Or they're switching over a product line. Those temporary layoffs, if Kellogg was adding a third line, which is what the proposals were, then they'd be able to hire casuals while these people are temporarily laid off. A permanent layoff... Why would you be hiring casuals or anybody if you're laying off people because there's no work? There's not work temporarily. What happens is people work on a line. And the idea, Kelly, this is also part of the misrepresentation here on the record, is behind these proposals, Your Honor, what was said at the table is the idea of the savings came from Kellogg growing the Memphis plant. The Memphis plant had just lost 2 lines because their costs were up and so they say pounds were down. And Kellogg's idea was to expand this casual group of employees and to bring new work in and to add 80 new employees to the plant. As casuals? As casuals, yes, Your Honor. And then the idea was that those savings would come from that. But not lay off any... No, add to the plant. No, all the savings on the slide and I forget the exhibit number, Your Honor, you can see it. They depicted it and talked about it to the other side. And again, the testimony at the hearing was clear on that. The idea was to build the plant back up. And so when the union said, hey, we're concerned about losing jobs, we said, no, that's not the idea here and we can't, and the permanent layoff, the permanent layoff language is important here. And that came up at the hearing at Lacey... I got her name wrong at the hearing too. Lacey, she was the Labor Relations Director there and she testified. And this is her testimony at page 693 at line 11. So did the company's last best offer change anything about what would happen in the event there was a layoff, permanent layoff? No. Do the regular employees lose any rights in the event there is a permanent layoff? No. So would it be right to say that... It didn't change a thing there. Would it be right to say then, assuming that everything you've said up to now is the way it would work, that the indirect impact, if any, would be that the new people you did bring in would come in as casuals as opposed to coming in as regulars? Correct, Your Honor. So then the question becomes whether that is then contrary to the master agreement. Right. And there's nothing in the master agreement... Again, there's nothing in the master agreement... So there would have to be an allocation of work provision in order for that to violate the master agreement? Exactly. Exactly. And think about this. The master agreement recognizes the existence... Can I finish my answer? Yes. The master agreement recognizes the existence of two bargaining unit classifications. Two bargaining unit classifications exist, regulars and casuals. All Kellogg's proposal did was no different than it did in 2010 when it added casuals in Memphis. They went to the union, then said, we have zero, we'd like to have at least 30%. They said, now we'd like to expand that and hire more of them in order to make that happen. Well, the cap would have gone, though. That's one change you wanted. Sure, absolutely. The cap would have gone. Yes, sir? The cap is in the master agreement. Or in the master. No, no. The cap, and that's an interesting, if I may answer... Yes. Okay. The cap is only in the supplemental agreements and what's interesting about that history is that's work preservation language and that's the only place you find it in the supplemental. And you look at the other supplementals, Your Honor, in Omaha, they have a 20% cap. In Lancaster in 1980, when it first came up, this idea of casuals, it came up at the local level in Lancaster. They didn't have a cap at all. And then they went to 30% cap, because that's what the union wanted, and then they went to 40%. Bargained at a local level. So this idea of how this work is allocated between bargaining unit people have always been negotiated locally. And another point on that is it's not just work between regulars and non-regulars, Your Honor. Work shifts between classifications of people that are regulars. In all of that, bargaining is done at a local level. One of the statements made by the general counsel in his brief is to say that wage rates have always been bargained at the national level. That is absolutely false. They have never been bargained at a national level. I think you're going... I'm sorry. Did you have a question? I wanted to ask a different line of questions just for a second, because I'd like to hear from the NLRB on this as well. One thing that is troublesome about this sort of from a timing standpoint is you can't solve this at the local level so you lock them out. They're locked out for nine months, as I understand it. Correct, Your Honor. Then the judge puts them back to work. And that's today's situation, I assume, right? Yes, Your Honor. Now, we're told that the master agreement, which they say controls all of this, is up for bargaining in October. Correct, Your Honor. So, I mean, as a practical matter, it is troublesome, the idea they're working, they're not working, now they're back to work, and then I guess what you want us to do is to say you can boot them out again for just, for what, a short period of time until you resolve that through bargaining on the national contract? Your Honor, we have no intention of booting those people out of work again. What we want to do is we want clarity on this issue. Think of the debate we just had. Bargaining is not supposed to require five lawyers and 16 different interpretations. National labor policy is you're supposed to be able to go to the table in bargaining over mandatory topics of bargaining. The local bargaining is where this unit is. It's where all mandatory topics must be bargained. And what Kellogg wants is clarity. Because with clarity comes bargaining. In terms of clarity, the board is going to rule on whether the ALJ was correct or not soon, right? I have no idea. I mean, some cases... Well, it's been a while. Your Honor, I'm not trying to be... Some cases get heard and tried in six months and some take 10 years. I assume it's someplace in between. Why shouldn't the injunction remain in place until the board rules? Because this circuit's legal standard requires two things. It requires that there be reasonable cause. Just and proper. And just and proper. And there is neither. And there's no reasonable cause because there's no substantial legal theory, I think, as evidenced by the general counsel's own brief. I mean, what's the legal theory? Where is the case? Has this court ever denied an injunction under similar circumstances? I believe so. I believe this court has found there not to be reasonable cause in maybe one case. I can't remember off the top of my head. In one case in total. And then my question is, were the circumstances similar and do you remember the name of the case? I don't think they were similar in the fact that the fact pattern... This fact pattern is very unusual. I mean, I agree with that. It's an unusual fact pattern. But again, because it's unusual for the general counsel not to come in here and say, here's the legal theory, here's the case. So what is the case that you think... I have to look back on this. I'm sorry. I don't look for my rebuttal. I'm sorry. Unless there's another question, I think. Just to follow up on that, you seem to be representing to us that Kellogg does not intend to lay these people off again. To black them out? That is not their intent right now. I mean, I can't believe that you're making that representation or commitment open-ended. So is there a way... Excuse me. I'm sorry. Is there a way that you and the NLRB can read, do you think, can read some sort of stipulation, to the extent that that makes anybody in this panel nervous, to know what your intentions are vis-à-vis the October bargaining and the decision of the Board on the underlying appeal? Your Honor, is that possible? Yes. That was a tried... The order also imposes on Kellogg is a restriction on bargaining over this topic to some degree. I don't quite understand the court's order. And secondly, that we can't implement. Not only can't we lock out, we can't say we're at impasse and implement. And so that has been a roadblock to settling this. That is... I can't get into settlement sessions. The idea of having the employees back to work and implementing our final offer is certainly acceptable to Kellogg. Yeah, but that's not going to be acceptable to the other side, I'm sure. I don't think so, Your Honor. Were the... You put the people that were locked out back to work. Is there an issue of back pay? Was back pay paid, or is that up in the air? That is up in the air, Your Honor. That will be decided through the process. That's another reason why, even though October isn't that far away, you would hopefully want the back pay issue resolved in your favor. Correct, Your Honor. That is our hope and our belief. That will be. Thank you. Thank you for your time. Thank you for your patience. May it please the Court. My name is Casey Compton for the NLRB. This case is not about Kellogg trying to hire a few casuals in Memphis. Kellogg didn't even hire... didn't employ any casuals at the time the bargaining began in Memphis. This case is about Kellogg trying to lower its labor costs by converting its Memphis workforce into casual employees. Now, Kellogg's appeal raises two issues before this Court. Number one... He just said that the last best offer was they wanted to add more people at a lower wage rate. Assuming that that is true, is there anything wrong with that? Does that violate labor law? No, Your Honor. Why don't we take whatever their final best offer was at face value? Their final best offer said that Kellogg had the right to hire as many casuals as it wanted to on an indefinite basis, and those casuals could do any bargaining unit work in the plant. Okay, stop right there. Is there anything that violates federal labor law up to now? To the extent that, and if I may say, what the best offer also said is that Kellogg was not restricted from hiring casuals to replace laid-off regular employees. Now, to the extent that that proposal, as I read it, and combined with Kellogg's statements at the table that it intended to hire only casual employees and ultimately employ only casual employees in Memphis, that subsumes the regular employee status. He says the contract prohibits them from putting somebody on permanent layoff if they're going to replace them with a casual employee. Does the contract prohibit them from doing that? Kellogg admitted at the bargaining table that under its proposal in Memphis, it could lay off regular employees and recall them as casuals. Its proposal also stated that it could lay off regular employees and they could be replaced by casuals. Now, you know, the District Court had Kellogg's bargaining statements at the table and it had its proposals. And these were the proposals for the renegotiation of the Memphis agreement? Yes, Your Honor. It was for the Memphis Supplemental Agreement. And so the real question for us is whether the main agreement governs and whether this is something that is not a mandatory bargaining issue for the local agreement. Is that right? Yes, Your Honor. So what do you think in the main agreement prevents this from being a mandatory bargaining issue in the local agreement? The master agreement governs wages and benefits. The effect of Kellogg's proposals in Memphis would be that the master agreement wages and benefits would simply not apply to the Memphis workforce. It's not quite that simple. What Milwaukee Springs says is you've got to point to a specific provision in this agreement that would be violated. And you haven't cited one anywhere in your briefs that I can find. So just tell me what provision I should look at here. The wage and benefit provisions, Your Honor. What is it? Which one? Well, I believe it's the wage appendix attached to the master agreement. Hold on just a minute. The only thing I could find in the agreement was a provision that says casuals get $6 less. Correct. It doesn't say what the wages are. Correct. Now, what your opponent says is those wages are set at the local level. You say they're set in an appendix? Well, the master agreement sets the wages for regular employees, and the Memphis supplemental copied it. So they are the same. Where do I find in the master agreement that it sets the wages? Your Honor, I believe there's a wage appendix that lists the COLA, that lists a progressive wage schedule, and that exact schedule is copied into the Memphis supplemental. Do you know what page that is by chance? Could I read this? Thanks. Let me see. I believe the wage appendix. I'm sorry for taking up time here. Oh, that's all right. It's on page 66. Okay, thank you. So it lists the COLA, new hire, progression, et cetera. And that is copied into the Memphis supplemental. But I'd like to get back to, if I may, what the district court found and what this court must decide, which is was it clear error for the district court to find that the director's theory of violation was insubstantial? Before you get into that, could I just lock this up? So in terms of a provision that you say their proposal would violate, it's the wage appendix at page 66? And the benefits. And the benefits that the master agreement guarantees to employees, which would no longer apply to the Memphis workforce, because there would be no regular employees employed there. That is the problem. Kellogg's has framed its proposals in Memphis from the very beginning as only being about casuals. They only want to employ casuals. The problem is that. Is there an allocation of work provision in this agreement? In the master agreement? In any agreement. Well, I don't believe that the agreements. It is true, as Kellogg says, that at the local level the parties can negotiate how casuals are used. But what I'm trying to figure out is if there isn't an allocation of work provision, which is something that exists in the labor field, right? Right? Yes. So if there isn't one, even if you're right that eventually regulars go away and they're replaced by casuals, what provision of the master agreement does that violate? The entire master agreement would not apply to that workforce. It would be a nullity. And that just can't be right. Parties are entitled to rely on their bargains. Industrial peace demands this. When parties enter into a contract. So if I'm an employee at this Memphis plant, I'm a regular employee. Yes. My being terminated is subject to the terms of these various agreements, right? Yes. And that's for cause, I assume. It's not at will employment. So something has to happen for me to lose the benefits of this wage appendix here. Now, what he says is that I can't be laid off permanently and replaced by a casual. Is that true or is that untrue under the agreement? Under Kellogg's proposal, which is...  Under the existing... What you say is the existing situation is being changed in violation of labor law. So can I... I'm this hypothetical employee. Can I be laid off and replaced by a casual? Under the current agreement, as I understand it, if you are a regular employee in Memphis, you can be laid off for business reasons and not replaced by a casual. That was a change. Kellogg wanted to be able to do that. So currently, if you are a regular employee in Memphis and you're laid off for business reasons, Memphis... I'm sorry, Kellogg cannot use casual employees until those laid off regular employees have been recalled. They wanted to change that. If that's true, then under this hypothetical, unless their last best offer says that's what they're going to do in violation of the agreement, then there's nothing to be enjoined, is there? There's nothing being enjoined. If the proposal that caused your... Not yours, but the employee. If the proposal that caused the union to walk out and refuse to bargain didn't violate this provision about a regular employee can't be laid off so that a casual can be hired, then there would be no reason for an injunction there, would there? Well, I'm not sure. I mean, the facts are here that Kellogg wanted to be able... Now, whether it was going to or not, I don't know. It wanted to be able to lay off its employees and either replace them with casuals or make them casuals. The only place that would prohibit that would be the master agreement. Well, the master agreement would be void at that point. Their proposal all along has said that anything that's contrary to the master agreement is not valid. They're not proposing anything in violation of the master agreement. That's what they've said. Well, I think your analysis of Milwaukee Spring, if I could go back to that, is I think Milwaukee Spring is distinguishable, frankly. How is it distinguishable? Well, Milwaukee Spring, first of all, was a partial relocation, and relocations have a whole host of different issues involved with them. But putting that aside, what the board said in Milwaukee Spring was that the relocation decision and the relocation of a few of the employers' departments did not change the remaining employees' wages. So there wasn't a modification of the contract with respect to them. Why isn't that true here? Because here, under Kellogg's proposals that would give it the right to employ all casual employees in Memphis, regular employees, those employees in Memphis, their wages and benefits would most certainly change. New ones or the old ones? Both. How does it change for the old ones? Because currently regular employees in Memphis could be laid off under Kellogg's proposal and either replaced or converted to a casual employee. Their proposals say that, and Kellogg's bargaining agent at the table said that numerous times to the union. So a key feature really is the fact that under your understanding of the Kellogg proposal, someone who's a regular employee at Memphis could be laid off and then rehired as a casual employee and therefore deprived of the benefits of the wage appendix and the fringe benefit. Absolutely. There is nothing in Kellogg's proposal that would prevent it from doing that. And in fact, its proposal affirmatively gave it the right to do that. So where do we find this affirmative right to do that in the record? What should we look at to verify what you just said? I think Kellogg is trying to make the director's theory perhaps more complicated than it is. I'm asking you. Where do I look for the support for what you just said in the record? Well, again, I think the crux of the director's theory is that Kellogg's proposals violate the master agreement's wage and benefit guarantees because they would be void. They would be nullified. I have to assume that if you won't answer my question where it is in the record, that you must be conceding that it's not in the record. Well, the master agreement is certainly in the record. The master agreement is in the record? Yes. Okay. So then we're back to the wage appendix? Yes, of course. The wages and benefits guaranteed by the master agreement would not apply in Memphis. That is the crux of Kellogg's proposal. Well, could Kellogg – maybe a way of getting at this is could Kellogg – the Memphis agreement as it currently exists or existed when they started bargaining allowed for 30% casuals? Correct. So could Kellogg insist on bargaining to increase the number of casuals to 40% in Memphis? Sure. What's to stop them? Right. Where does the slippery slope end? That's an interesting question. You know, where between 30% and 100% is the line? Frankly, I don't know. Because you're saying it can't be 100% because that will eliminate regular employees, and if there are no regular employees, there's nobody to apply this wage appendix on page 66, too. Right. Does that mean that the only time then if they were to do this that it would violate the master agreement is when they got to 100% and there are no regular employees? I don't believe that that's the only time. All I'm saying is that – Well, what other time? Well, we don't have that case, and that's really for the board to decide, and I think that's the whole point of the injunction here, is the district court found that the director's theory was substantial and non-frivolous and found that that injunction was just improper to protect the board, to protect the board's ability to decide this case. The only way that your theory is substantial is if you ignore Milwaukee Springs. Except for your distinction that Milwaukee Springs was shifting work to another plant instead of reallocating work among employees at an existing plant. Well, Your Honor, the – That's it, isn't it? Well, I don't believe that that's true. I mean, in our brief we cite numerous AD modification cases, include, for instance, a case called CNS Industries from back in 1966 where the board found that an employer's wage incentive system modified the contract's wage provision. Now, there was no – in that contract, there was no wage incentive provision, but the proposal that the employer was trying to offer would have changed the contractual wages. In these cases, the board looks at what the proposals are actually going to do, not just what's written on the top of them, whether casual is slapped on there or not. The board looks at what are the proposals going to do, and realistically, how is the party's contract going to be modified? And here, the district court would – The board does that under Milwaukee Springs, or the board does – Under AD cases, sure, sure. Under what cases? I'm sorry, Section 8D? 8D. Yes, yes. What are Section 8D cases? What does that mean? If I may answer my time's up. Section 8D is a section of the Act that lays out the party's obligations to bargain. And when we talk about Section 8D modification cases, we're simply saying we're talking about cases where parties have a contract that they're entitled to rely on, and one party – usually it's an employer – is trying to force the other party to change a provision in the contract. So 8D modification cases, that's sort of shorthand for those kinds of cases. Was Milwaukee Springs an 8D case? The board did – well, it was a relocation case. But the board did look at – there was an argument in that case, yes, that the relocation somehow changed the party's contract. And again, in that case, the board found that – I mean, the first section says midterm modifications of contracts under Section 8D. Correct. The first part of – Yes, indeed. So then they go on to say you've got to look at the agreement. Right, exactly. And you have to identify a provision of the agreement that is being changed. But isn't that considerably different than what you were just saying, that in addition to looking at what the language said, how that would be a novel concept, you also look to see, well, gee, what are they really thinking? That's sort of what I got from your last statement. Well, certainly the board always looks at what the proposals themselves, what's written down on paper, and what's said at the bargaining table. What did the proposals mean? What did the parties mean by their written proposals? The board always looks at that evidence if it's available. And here, certainly, the evidence shows that Kellogg intended to replace its entire workforce in Memphis. And the district court so found – and since my time is up. Well, the ALJ has ruled the other way. And the case is now pending in front of the board. So we can hypothesize two different tracks. If the board were to rule next week to affirm the ALJ, I take it the injunction would no longer exist. It moots out either way. So it moots out either way because no matter what the board does, the board governs. Is that right? Yes. Once there's a board order, whether they uphold the ALJ or overturn it, the injunction is gone at that point. So the whole purpose of a 10-J injunction is to preserve the status quo pending resolution by the board. Exactly. However the board decides. The purpose of the 10-J injunction is not to preserve our theory. It's to preserve what the board ultimately says, the board's remedial authority. The ALJ's decision, of course, is just a recommendation. The board reviews ALJ's decisions de novo. Mr. Boudet says that you have to have accepted to findings of the ALJ in connection with an appeal. Is that correct? Right. So did the ALJ find that there was no modification of the master contract here? The ALJ found that Kellogg's, well, it recommended that the board find that Kellogg's proposals did not modify the casual provisions of the master agreement. Well, wait a minute. And you accepted from that? Well, I don't think that Kellogg's proposals did modify the one casual provision in the master agreement because Kellogg's proposals weren't really about casual employees. What was your appeal to the board based on? Well, we appealed to the board based on the fact that we believe, again, it was what we argued in this case, that Kellogg's proposals would change the wage and benefits of the regular employees as they are governed by the master agreement. Now, we believe that that was a substantial theory, a non-frivolous theory, as did the district court. We'll wait and see what the board says. Are you claiming any obligation on the part of Kellogg to hire, if they hire new employees, to hire them in the regular employee status? I don't think, I mean, the board doesn't evaluate whether, who Kellogg should hire. You say that these proposals emasculate regular employees. That can happen either in connection with the people who are currently regular employees. It could happen in connection with future hires, right? Correct. So are you saying that these proposals violate some rights under the master agreement with respect to future hires? Well, to the extent that all future hires in Memphis would be casual... Let's assume that every single one of them from here on out is casual. Does that violate the master agreement? Well, it does in the sense that there would no longer be a regular employee classification in Memphis. And so the wages and benefits that the parties negotiated in the master agreement don't apply to that whole workforce anymore. That contract is null. Sure it does. It applies to all the current regular employees. If Kellogg were to hire a few casuals... No, I want to take this to the extreme to try to make you understand and make your point. Let's assume you've got these regular employees and every single new employee they hire, for whatever reason, is a casual employee. Does that violate the agreement? Well, I mean, I don't know if you're talking about replacing the entire workforce so it's one for one. I didn't add that. The hypo is a gradual change, obviously, in terms of proportions, but the new hires would be casuals. Can every new hire be casual? I don't know. I mean, Kellogg's proposal wasn't... You can't get an injunction on something you don't know, right? Are you alleging that they can't? Well, the district court found that Kellogg's proposals weren't that all new hires, one by one, would be casual. Its understanding of Kellogg's proposals were that future and current employees could be casual. Now, if Kellogg's proposal hadn't had the and current part in there, would it be unlawful? We would have a different case, and I don't know the answer to that question. And lastly, at least I think it's lastly because I'm sorry I've extended you over your time. Do I understand from Mr. Boudet that the order from the district court in this case precludes the union and Kellogg from even talking about this stuff to clarify what seems to be the dramatically differing views as to what Kellogg says they will and won't do? Well, the district court's order orders the parties to not force... Orders Kellogg to not force the union to bargain over non-mandatory subjects of bargaining. So if they wanted to bargain over casual employees and where to raise the cap, you know, do we make it 35%? You know, that presumably would be a local subject. So you say your understanding is they can talk, they just can't force them to talk? Exactly. Exactly. That's what I wanted to know. Absolutely. Orders often in cases like this are really prepared by the board and the district court enters them, aren't they? I'm sorry. Aren't these orders in all these cases like this often prepared by the NLRB? They present a proposed order and the court enters them. I'm not sure, Your Honor. I'm not sure how that works. I mean, certainly the court's order tracks what would normally be ordered. And, of course, this contract is coming up, but the no time limit on the board acting is kind of a cause of concern in a lot of these cases. And not that this has any bearing on anything, but as long as this injunction is in place, the board really isn't incentivized to do anything if they have other matters on their plate because they've got the relief that they're really looking for. Well, I would disagree in the sense that injunction cases are priority cases for the board. You're right that the board has a lot on its plate, certainly lately with the no canning decision, et cetera. But this case as a 10-J case, by definition, is a priority for the board. So while I can't predict when a board order would issue, I have every confidence that they are treating it with priority review as they should be. The briefs are concluded? Everything is concluded, and it is currently actively being considered, yes. So is there oral argument before the board? I don't believe so. I don't believe they're going to have arguments submitted on the briefs. Thank you. So thank you. A couple of few points, hopefully a quick clarification. If you look at Kellogg's last best offer, this idea about what the layoff language has changed, section 4.01, if you read the language, it talks about temporary layoffs. That's the new language that Kellogg added to hiring casuals. That's the only change. It does not apply to permanent layoffs. It's simply wrong. On the 8-D analysis, the board ---- If we could stop you right there for just a second. I am sort of troubled by figuring out if you start the bargaining and your agent says something off the wall, you might pull back from that during the bargaining, and your last best offer before the union walks out might be something different. So how do we measure what the effect of this proposal really was to sort this out? What your agent said in the beginning or what this last best offer is? Well, this last best offer, and I think look at the agreement. What would be the contract? Because this is a bargaining case, and everybody agrees now the topic of casuals is bargaining. It can be bargaining. We're bargaining. The arguments they're making are disagreements with the proposal. There's really nothing unlawful with Kellogg making the proposal that they claim is there. There's nothing wrong with Kellogg saying, hey, we want to have only casuals. You can bargain about that. There's nothing in the ---- Sure you could have because, Your Honor, the master agreement doesn't guarantee anyone any work. All it says is if you hire a regular, you'll provide certain benefits and give them certain wage increases. The wage rates are not in there. It says if you hire a non-regular, you will pay them a $6 difference. That's what it says. So we don't have to hire anyone. Flip this around for a second. Flip the general counsel's theory around. Do we have to hire a certain number of non-regulars? Those are bargaining unit employees. Does that change the wage and benefit provisions if we eliminate all casual employees? They're bargaining unit jobs. The master agreement doesn't have language in it that says we have to hire anyone. What happens if we have a new piece of equipment that's brought in? And the new piece of equipment results in regular employees being laid off. Does that change the wage and benefit provisions of the master according to general counsel's theory? It sure does. And your red light is on. I'm sorry. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?